UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN RE: 3M COMBAT ARMS EARPLUG PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>*Baker*, 7:20cv39<br>*Estes*, 7:20cv137<br>*Hacker*, 7:20cv131<br>*Keefer*, 7:20cv104<br>*McCombs*, 7:20cv94 | Case No. 3:19md2885<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Gary R. Jones |

# ORDER

Numerous expert challenges are pending before the Court, several of which relate to anticipated expert testimony regarding the Army Safety Program and, more specifically, the Army Hearing Program. Plaintiffs proffer two experts on the subject, Brigadier General (Retired) Timothy J. Edens and Sergeant Major (Retired) Blaine Huston,[1] and Defendants proffer five, Dr. Eric Fallon, Lieutenant Colonel (Retired) Vickie Tuten, Dr. James V. Crawford, Dr. Richard Neitzel, and Jennifer Sahmel.[2] Both sets of experts opine, based on their knowledge and experience, on the history, purpose, intent, and implementation of the programs. The experts also

---

[1] Plaintiffs do not intend to call their third "military" expert, SGM (Retired) Christopher Marshall, to testify at trial. Accordingly, this Order does not address SGM Marshall's testimony.

[2] Plaintiffs' challenges to Dr. Neitzel and Jennifer Sahmel will be addressed by separate order.

opine on the success (Plaintiffs) or failure (Defendants) of the Army's hearing conservation efforts and on a purported "culture" of compliance (Plaintiffs) or non-compliance (Defendants) with the Army's programs and regulations governing safety and hearing protection. Not surprisingly, both sides' primary objections to the other's experts are mirror images. Each argues that the other's experts' opinions are not reliable because they are based on their limited and unquantifiable personal experiences. In light of these parallel arguments, the Court finds it is appropriate to generally address the proper scope of these experts' testimony before addressing particular expert-specific issues.

As a general matter, these experts' testimony regarding the history, purpose, intent, and implementation of the Army Safety Program and Army Hearing Program is proper to the extent it is reliably based on their experience with and knowledge of the programs. While none of the experts tie their opinions to any specific Plaintiff in this case, this portion of their testimony will be helpful in assisting the jury with understanding the Army's safety and hearing conservation programs, which are relevant. For example, General Edens may opine on "organizational apparatus, regulations and policies" and explain why the prevention of hearing loss is "of particular importance to the Army" and how the Army seeks to implement the programs. *See* Edens Report at 2. Sergeant Major Hutson may opine about the success of Army's training program and how well it works to promote safety and

hearing conservation based on his own *personal observations*. Similarly, LTC Tuten may opine on how her "*personal experience* as an audiologist revealed that there was a significant disconnect between what was required by regulation and what *I was seeing* done and complied with in practice." *See* Tuten Report at 13 (emphasis added). Dr. Fallon and Dr. Crawford may also testify to a tension between combat readiness and hearing conservation to the extent the testimony is based on their own personal observations, experiences, or empirical research and not on speculation or on something relayed to them by others. *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (emphasizing that an expert's testimony must be "properly grounded, well-reasoned, and not speculative before it can be admitted" (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments)). However, the experts' opinions regarding the *Army-wide* success or failure of hearing conservation efforts or a purported "widespread" culture of compliance or non-compliance with Army safety and hearing conservation program requirements is improper and will not be allowed.

For example,[3] Plaintiffs' experts opine that "*all Soldiers* and civilian personnel in the Army practice the culture of safety (including with respect to hearing protection)," *see* Edens Report at 2 (emphasis added), and that "the [Army

---

[3] The Court declines to parse each expert's report and deposition to compile an exhaustive list of improper testimony that falls within this category. The following illustrative examples should suffice to enable counsel on both sides to tailor expert testimony at trial.

CASE NO. 3:19-md-02885/MCR/GRJ

Hearing Program] is very effective and is followed strictly *across the Army*," see Huston Report at 14 (emphasis added). Defendants' experts opine "as to the *widespread* non-use of hearing protection devices *within the military*," see Fallon Notice at 9 (emphasis added), that "the [Army Hearing Program] was not implemented consistently *across installations*," see Tuten Report at 5, and that the *entire* Army "fell short" and "did not accomplish the task" of preventing hearing loss and protecting servicemembers' hearing, see Crawford Report at 1. These witnesses fail to explain how their experiences (*e.g.*, serving at specific military installations during certain periods of time or even as a Hearing Program Manager) or their methodologies (*e.g.*, drawing broad conclusions about the entire Army based on their experience and at most a review of a handful of case depositions and expert reports) constitute a sufficiently reliable basis for their sweeping opinions of Army-wide success, failure, compliance, or non-compliance.[4] *See Frazier*, 387 F.3d at

---

[4] The cases cited by the parties in support of their arguments are distinguishable. Plaintiffs cite *United States v. Colonial Pipeline Co.*, No. 1:00-CV-3142, 2003 WL 26131791 (N.D. Ga. Jan. 14, 2003) and *Mamani v. Berzaín*, No. 08-21063, 2018 WL 1010582 (S.D. Fla. Feb. 22, 2018). In *Colonial*, the parties disputed the expert's *qualifications*, not the reliability of his testimony. *See* 2003 WL26131791, at *1. In *Mamani*, the court found that a cultural anthropologist's opinion based on his years of study and research on Bolivian culture "(barely) pass[ed] muster under the *Daubert* standard." 2018 WL 1010582, at *5. While a cultural anthropologist's years of studying and researching a particular country's culture may suffice to ensure the reliability of his opinions about that culture, the Court does not agree that the same can be said of these experts' opinions about the Army's culture, something none of them have studied. Defendants cite *Superior Consulting Services v. Shaklee Corp.*, No. 6:16-cv-2001, 2018 WL 3059995 (M.D. Fla. May 31, 2018), *Washington v. City of Waldo, Fla.*, No. 1:15CV73, 2016 WL 3545909 (N.D. Fla. Mar. 1, 2016), and *Allmond v. Akal Security, Inc.*, No. 4:05-cv-96, 2007 WL 988757 (M.D. Ga. Mar. 29, 2007). The experts in those cases opined on limited issues such as a single business's practices, *see Superior Consulting*, 2018 WL 3059995, at *5, a police department's hiring of an officer, *see*

1261 ("[I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments)). In many instances, the opinions are based on unspecified conversations with unidentified servicemembers and audiologists, *see, e.g.*, Tuten Report at 16, 18 (opining on the "frustrations expressed" by unidentified "military audiologists" and "anecdotal information relayed to me" by "soldiers"). There is no showing that these are sources of information "of a type reasonably relied on by experts in forming opinions or inferences" about the Army-wide level of success of a program or a purported Army-wide culture.[5] *See United States v. Williams*, 447 F.2d 1285, 1291 (5th Cir. 1971). Allowing these experts to opine about circumstances throughout the entire Army based on limited personal accounts and

---

*Washington*, 2016 WL 3545909, at *2–3, and the U.S. Marshals Service's policy regarding hearing aids, *see Allmond*, 2007 WL 988757, at *4. While those experts' experiences may have made their testimony regarding such limited issues sufficiently reliable, the Court finds that the parties' experts' experiences do not suffice to ensure the reliability of their opinions about Army-wide levels of success or compliance with hearing conservation efforts.

[5] The Court recognizes that, in some fields of expertise, drawing conclusions based on the gathering, analyzing, and synthesizing of hearsay accounts may be a generally accepted methodology. *See, e.g.*, *United States v. Kantengwa*, 781 F.3d 545, 561–62 (1st Cir. 2015) (finding that an expert's method of drawing conclusions "based in part on the *consistency* of the accounts" he gathered regarding a historical fact was "consistent with generally accepted historical methodology"). But there is no indication that these experts' reliance on hearsay in forming their opinions is a generally accepted methodology in any field of expertise, let alone in the fields of audiology or Army safety and hearing requirements.

information relayed to them by an unspecified number of third parties would be to sanction their use as a vehicle for introducing hearsay testimony. *See Marvel Characters Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." (citation omitted)). Like the inadmissible expert testimony in *Marvel*, these portions of the parties' experts' opinions "do not bring their expertise to bear" because they are based on inferences that "are by and large undergirded by hearsay statements." *See id.*; s*ee also United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012) ("If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then . . . the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement."); *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-24277, 2017 WL 10775768, at *30 (S.D. Fla. June 12, 2017) ("Although an expert's opinion is not subject to exclusion merely because the expert considered hearsay information, [the expert's] opinions on these [hearsay statements] are not actually opinions – they are merely an attempt to focus on, and emphasize, certain facts which were developed."), *report and recommendation adopted*, 2017 WL 10775767 (S.D. Fla. Dec. 14, 2017); *Bowe v. Pub. Storage*, No. 1:14-cv-21559, 2015 WL 10857339, at *8 (S.D. Fla. June 2, 2015)

(excluding portions of expert's opinion that were "not based on his expertise and instead constitute a presentation of other evidence in the guise of an expert opinion" and were therefore "an improper presentation of hearsay evidence").

The "relaxation of the usual requirement of firsthand knowledge" is "premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). Here, the parties ask the Court to simply accept the experts' opinions as reliable because the experts are experienced. This runs counter to *Frazier* and *Daubert* and is akin to asking the Court to accept the expert's *ipse dixit*. *See Frazier*, 387 F.3d at 1261 ("If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong."). The bottom line is that there is no verifiable or quantifiable support for the opinion that the Army Hearing Program was a complete success or an utter failure at protecting servicemembers from hearing loss.[6] These experts' broad opinions are based solely on their own generalized views, anecdotal accounts, and speculation and thus are not reliable. *See id.* at 1260.

---

[6] To be sure, other than Department of Defense ("DoD") regulations and Army guidance, which the experts merely recite, none of the experts addressed in this Order cite to or rely on any empirical evidence to support their opinion that the Army Hearing Program was a success or failure during the relevant time frame.

CASE NO. 3:19-md-02885/MCR/GRJ

Accordingly, the parties' *Daubert* motions are granted to the extent they seek to exclude expert testimony regarding Army-wide success, failure, compliance, or non-compliance with safety and hearing protection requirements.

**A. Plaintiffs' Experts**

*i. BG Edens*

General Edens graduated from the United States Military Academy and served in the Army for thirty-three years, including as the Commanding General and Director of Army Safety, United States Army Combat Readiness/Safety Center. He directed the Army Safety Program, which encompassed hearing readiness and conservation. As previously stated, the Court finds that General Edens' extensive experience and expertise in the Army Safety Program is a sufficiently reliable basis for his opinions and explanations regarding the operational apparatus, regulations and policies that form the program, the intent of the program, and how the Army sought to implement the program. Defendants' objections that General Edens' opinion is "contradicted by military data and record evidence that [he] did not consider" and that his command experience is limited to aviation soldiers goes to the weight of his testimony rather than its admissibility.

*ii. SGM Huston*

Sergeant Major Huston served in the Army for twenty-eight years. During his career, he served as an Infantry Drill Sergeant and trained thousands of

servicemembers regarding the circumstances under which they should use their assigned hearing protection devices. He also served as the Deputy Commandant of the United States Drill Sergeant School from 2012 to 2014, where he trained other Army drill sergeants. The Court finds that Sergeant Major Huston's extensive experience in the Army's training of infantrymen and drill sergeants is a sufficiently reliable basis for his opinions and explanations regarding how the Army educates soldiers about hearing conservation and enforces compliance with hearing protection requirements. Defendants' objections that Sergeant Major Huston's opinion is "contradicted by military data and record evidence that [he] did not consider" and that his enforcement of hearing protection requirements did not entail verifying that soldiers' earplugs were fitted properly goes to the weight of his testimony rather than its admissibility.

## B. Defendants' Experts

*i. Dr. Fallon*[7]

---

[7] Defendants initially disclosed Dr. Fallon to Plaintiffs as a "3M employee with knowledge of 3M business operations and Combat Arms marketing, including to U.S. government customers." *See* Def. Initial Disc., ECF No. 1560-4 at 2. Following his deposition testimony, Defendants subsequently disclosed Dr. Fallon as a hybrid witness "who may also provide expert testimony at trial." *See* Emergency Mot. Protective Ord., ECF No. 1558-1 at 1–2. Defendants asserted that this testimony will be based on "'direct and personal knowledge' that [Fallon] acquired about the CAEv2 and the military's use of hearing protection" in the ordinary course of his job function. *See id.* at 2. Defendants have not submitted a Rule 26(a)(2)(B) expert witness report for Dr. Fallon and have instead submitted a Rule 26(a)(2)(C) disclosure. Plaintiffs do not challenge Dr. Fallon's designation as a "hybrid witness." As the Court indicated at the February 5, 2021 hearing, Dr. Fallon's fact testimony and expert opinion testimony will be clearly differentiated at trial. To the extent he purports to provide expert testimony, his testimony "must

Dr. Fallon served in the Army for twenty-four years, including as an audiologist, as the Hearing Conservation Program Manager at the United States Army Center for Health Promotion and Preventive Medicine (CHPPM), and as the Director of Audiology and Speech at the Walter Reed National Military Medical Center. Dr. Fallon was also involved in training Army medical personnel on fit and use of hearing protection devices, including the CAEV2. Based on his personal knowledge and experience, Dr. Fallon is expected to provide expert testimony on four primary topics: (1) the DoD's and Army Hearing Program's requirements and guidance as it relates to hearing conservation,[8] (2) the manner in which this guidance was or was not implemented, (3) the use of the CAEv2 in the Army, and (4) "the widespread non-use of hearing protection devices within the military."

The Court finds that Dr. Fallon's experience as an Army audiologist and as Program Manager for the Army Hearing Program is a sufficiently reliable basis for his opinions and explanations regarding the operational apparatus, regulations and policies that form the program, the intent and purpose of the program, and how the Army sought to implement the program. Dr. Fallon may also opine as to his personal observations of how the Army Hearing Program was implemented at certain Army

---

comply with the requirements of Rule 702 and the strictures of *Daubert*." *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317–18 (11th Cir. 2011).

[8] *See* DoD Instruction 6055.12 and the Department of the Army Pamphlet 40-501 (DA PAM 40-501).

installations and whether the program's requirements were followed at those installations to the extent of his personal knowledge. He can also testify to challenges he encountered as the Hearing Program Manager and program deficiencies he personally observed or experienced. However, Dr. Fallon's personal experiences and knowledge as an audiologist and even as the Hearing Program Manager do not provide a reliable basis from which he can extrapolate sweeping expert opinions about the deficiencies in the implementation of the Army Hearing Program throughout the entire Army and the impact of those deficiencies on servicemembers as a whole. *See Frazier*, 387 F.3d at 1261. Dr. Fallon has no quantifiable or verifiable support for that broad opinion.

Also, while Dr. Fallon may explain how he personally trained and instructed Army medical personnel on the use of the CAEv2, he may not opine on what was "understood" or "well-known" by "the military" or "the military audiology community" regarding hearing protection in general or the CAEv2 more specifically. *See Bartlett v. Mut. Pharm. Co., Inc.*, 742 F. Supp. 2d 182, 195 (D.N.H. 2010) ("[M]ost courts have prohibited experts from testifying . . . about 'what doctors generally think,' unless the testimony is based on something more reliable than simply the expert's own experience as a doctor."). Dr. Fallon states as support for his opinion that at least one other audiologist, *i.e.*, Lieutenant Colonel Kathy Gates, knew that the CAEv2 was not a "one-size-fits-all-hearing-protector;"

however, Dr. Fallon has not provided any other basis, such as a survey or a widely distributed publication or even an email, to support the extrapolation of this knowledge to the entire military audiology community.  Furthermore, while training materials and the wallet card do state that fit may be achieved for those with "very large" or "exceptionally large" ear canals by folding back the opposing flange of the CAEv2, this does not show knowledge by the entire Army audiology community of the instruction.[9]  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Defendants have not provided evidence for the number of audiologists who received the training or the wallet card.  Likewise, they have not provided any verifiable or quantifiable support for Dr. Fallon's expert opinion that "a very low percentage of servicemembers were required to roll back [the] opposing flange of the CAEv2 to obtain adequate fit . . . ."  *See* Fallon Notice at 8–9.  While Dr. Fallon may give an estimate for the percentage of servicemembers he personally fit with the CAEv2 who

---

[9] The training and reference materials include PowerPoint presentations and wallet cards that include the terminology, "[f]or very large ear canals, fold the opposing plug back." The training materials and wallet card are admissible. The opinion that every audiologist in the Army knew of the fold-back instruction is not.

did not need to roll back the opposing flange, he cannot speak in generalities about *all* servicemembers.

Similarly, Dr. Fallon's limited personal experiences do not provide a basis for a reliable expert opinion on how "the military tend[s] to test our products and make their own determinations about how a product performs and how to use the product." *See, e.g.*, Fallon Depo. Tr. (12/20/2020) at 115:4–11 ("I really can't speak to what they did to test the [CAEv2]. . . . I have a – a vague memory of the Army Research Lab doing some attenuation testing [of the CAEv2], but I – I really don't know any more specifics of it other than that."), 127:1–18 ("I honestly don't have an opinion on who should provide those instructions [for the CAEv2] . . . I do not have knowledge of that. I was not part of that contract with the manufacturer."). Notably, Dr. Fallon joined CHPPM after the CAEv2 has already been purchased by the Army. *See* Fallon Depo. Tr. (09/04/2020) at 873:3–8 (testifying that he was not part of the evaluation the CAEv2 before it was approved); Fallon Depo. Tr. (12/22/20) at 116:25-117:6 (acknowledging he was not stationed at CHPPM prior to 2003). Additionally, while Dr. Fallon may testify as to his personal observations of servicemembers' use of hearing protection devices, he may not testify as to "widespread" practices based solely on his observation of "at least one example in Iraq" of an unspecified unit. *See* Fallon Depo. Tr. (12/20/2020) at 60:8–24.

Finally, Dr. Fallon also may not testify that "better deaf than dead" was a "commonly used phrase within the military." To the extent Defendants' contend this is "expert" testimony, it is due to be excluded under Rule 403. The testimony is of little, if any, probative value because there is no evidence that any Plaintiff used the phrase and any probative value is substantially outweighed by the danger of unfair prejudice. *See Frazier*, 387 F.3d at 1263 ("[T]he judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." (citation omitted)).[10]

*ii. LTC Tuten*

LTC Tuten served for approximately twenty-seven years as an audiologist in the Army, including as the Chief of Audiology at Brooke Army Medical Center and the Chief of Hearing Conservation at Fort Hood and Fort Bragg. The Court finds that LTC Tuten's experience as an Army audiologist and Chief of Hearing Conservation at various installations provides a sufficiently reliable basis for her opinions and explanations regarding the DoD's and Army Hearing Program's regulations and requirements. She may also testify as to her personal experiences and observations of the Army Hearing Program's implementation, including a perceived lack of resources and support from medical and operational resources at

---

[10] Even if this were within the bounds of Dr. Fallon's "fact" testimony, it is due to be excluded as inadmissible hearsay.

installations where she was stationed or installations she otherwise has personal knowledge of. LTC Tuten may not, however, testify that any lack of resources and/or operational support constituted a failure of the Army Hearing Program Army-wide and led to hearing injuries in servicemembers as a whole. She has no quantifiable or verifiable support for that broad opinion. Similarly, LTC Tuten may not testify that she "understand[s] that information was provided by the Army Public Health Command regarding a recommendation to roll the last flange back to get a better insertion of the CAEv2" or that "anecdotal information relayed to me was that no instruction was provided by the military staff handing out the CAEv2." *See* Tuten Report at 17, 18. Such speculation is wholly improper from any witness, much less an expert.

*iii. Dr. Crawford*

Dr. Crawford is board-certified in Otolaryngology and Neurotology and served in the Army for twenty-four years. He was the Chief of Otology/Neurotology at the Madigan Army Medical Center and represented the Army on the Executive Committee of the Hearing Center of Excellence. Based on his experience, Dr. Crawford intends to opine "about the regulations governing the Army Hearing Program and areas in which the Army fell short of implementing those regulations and did not accomplish the task of preventing hearing loss and protecting Servicemembers' hearing." *See* Crawford Report at 1.

First, the Court finds that Dr. Crawford's experience is a sufficiently reliable basis for his opinions and explanations of the Hearing Center of Excellence, the regulations governing the Army Hearing Program, and the importance of training and instruction relating to, and fitting of, hearing protection devices. Dr. Crawford may also opine on "the fact that medical readiness and hearing conservation are distinct" and testify about his personal experiences and observations of the "significant gaps in the training and fitting of hearing protection devices." However, Crawford provides no factual basis for his "understanding that Servicemembers were often provided hearing protection . . . without instruction or individual fitting." *See* Crawford Depo. Tr. at 172:23–173:4 ("Q: Okay. So you don't have any evidence, other than anecdotal statements or hearsay conversations with people; correct? [objection omitted] A: Correct."). He has no research study, no data—nothing—to substantiate this sweeping statement. While Dr. Crawford can testify to what a particular servicemember told him about hearing protection to the extent it relates to diagnosis or treatment, he cannot generalize about all servicemembers often not receiving instruction and fitting with their hearing protection devices. Similarly, Dr. Crawford provides no reliable factual basis for his opinion on what was "well-known within the military audiologist community and among relevant medical staff" or what was "understood within the military." *See Bartlett*, 742 F. Supp. 2d at 195. This is pure speculation and, again, improper, especially from an expert witness.  And

like Dr. Fallon and LTC Tuten, Dr. Crawford has no quantifiable or verifiable support for the opinion "that the Army fell short of implementing [its] regulations and did not accomplish the task of preventing hearing loss and protecting Servicemembers' hearing" and thus he may not offer it.

Several of Dr. Crawford's other opinions are also unreliable *ipse dixit*. *See Frazier*, 387 F.3d at 1261. First, Dr. Crawford opines that "in [his] experience . . . the military placed greater emphasis on its own testing over [Noise Reduction Rating] values." Second, he opines that "it has been [his] experience" that the military undertook responsibility for providing instruction and training on the use of military protection and did not rely on the instructions or training from the manufacturer.[11] Third, Dr. Crawford intends to suggest to the jury that the Army should have done more than the DoD regulations and Army guidance required by using "individual fit testing" and personal attenuation ratings for servicemembers; however, he concedes these are merely best practices suggested by the Center of Hearing Excellence and not the standard of care in either the military, federal

---

[11] Citing their deposition testimony, Dr. Crawford claims that his "experience is consistent with that of" Dr. Fallon and two fact witnesses. But none of these other witnesses are qualified to opine on this subject. Indeed, as noted, Dr. Fallon conceded in his deposition that he did not know whether Aero was required by the contracting documents to provide the CAEv2 training materials to the military and he only assumed the military would have created its own materials. *See* Fallon Depo. Tr. (12/20/2020) at 127:1–18. And even assuming they were qualified, none reached their conclusion using a reliable methodology. *See Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009) ("Experts may not . . . simply repeat or adopt the findings of other experts without investigating them."), *aff'd*, 609 F.3d 1183 (11th Cir. 2010).

government, or private sectors. *See* Crawford Depo. Tr. at 254:11–255:8, 263:5–17. It would be improper for Dr. Crawford to suggest to the jury that the Army failed its servicemembers by not following an aspirational protocol.

Finally, Dr. Crawford opines that "[m]ore recently," the HCE developed a set of training materials called "HEAR." Neither Defendants nor Dr. Crawford indicate that the HEAR training materials were in place for any Plaintiff in this case. Accordingly, this testimony is excluded because it will not be helpful to the jury. *See McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (explaining that expert testimony is unhelpful to the trier of fact unless a "fit" exists between the "offered opinion and the facts of the case").

Accordingly,

1. The parties' *Daubert* motions, ECF Nos. 1595 & 1605, are **GRANTED in part** and **DENIED in part.**
2. The motions are **GRANTED** to the extent they seek to exclude the portions of General Edens', Sergeant Major Huston's, Dr. Fallon's, LTC Tuten's, and Dr. Crawford's expert opinions identified as unreliable, unhelpful, or unduly prejudicial in this Order.

3. The motions are **DENIED** to the extent they seek to exclude these experts' opinions in their entirety.

**DONE AND ORDERED** this 11th day of February 2021.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**