## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS
LIABILITY LITIGATION

This Document Relates to:
*Luke E. Estes,* 7:20-cv-137
*Stephen Hacker,* 7:20-cv-131
*Lewis Keefer,* 7:20-cv-104

Case No. 3:19-MD-2885-MCR-GRJ

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

## <u>DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendants 3M Company and Aearo respectfully move (1) to reduce the punitive damages awards as they are unconstitutionally high and (2) to limit the punitive damages to a single award for the *Estes* and *Keefer* cases under Georgia law and to amend the judgment so that 75 percent is paid to the State of Georgia, consistent with Georgia law. Defendants further renew the issues raised in the motion for judgment as a matter of law made at the conclusion of Plaintiffs' case-in-chief. In support of this motion, Defendants submit the following memorandum of law.

# **TABLE OF CONTENTS**

**Page**

I.  THE PUNITIVE DAMAGES AWARDS ARE
    UNCONSTITUTIONAL...................................................................1

    A.  Introduction ...........................................................................1

    B.  Legal Standard........................................................................2

    C.  Argument.................................................................................6

        1.  Defendants' Conduct Was Not Reprehensible...................6

        2.  The Ratio of Compensatory to Punitive Damages is
            "Out of Whack".................................................................14

II. GEORGIA PERMITS ONLY ONE PUNITIVE DAMAGES
    AWARD......................................................................................16

III. DEFENDANTS RENEW AND PRESERVE THE RULE 50
     MOTIONS MADE AT THE CONCLUSION OF
     PLAINTIFFS' CASE-IN-CHIEF ...............................................19

    A.  Causation ..............................................................................19

    B.  Plaintiffs' Negligent Misrepresentation, Fraudulent
        Misrepresentation, and Fraud and Deceit Claims Fail as a
        Matter of Law.........................................................................21

    C.  Plaintiff's Fraud by Concealment Claims Fail as a Matter
        of Law....................................................................................25

    D.  Estes' and Keefer's Warranty Claims Fail as a Matter of
        Law..........................................................................................26

    E.  Negligence per se ..................................................................28

    F.  Statute of repose—Keefer .....................................................29

    G.  Statute of limitations—Estes................................................30

CONCLUSION ......................................................................................31

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Action Marine, Inc. v. Continental Carbon Inc.*,
   481 F.3d 1302 ....................................................................................13

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996)..............................................................2, 3, 5, 6

*Bogle v. McClure*,
   332 F.3d 1347 (11th Cir. 2003) ......................................................3, 13

*Carr v. American Universal Ins. Co.*,
   341 F.2d 220 (6th Cir. 1965) ............................................................17

*Cisson v. C.R. Bard, Inc.*,
   2015 WL 251437 (S.D. W.Va. Jan. 20, 2015) ...................................19

*CMI, Inc. v. Intoximeters, Inc.*,
   918 F. Supp. 1068 (W.D. Ky. 1995)..................................................23

*Cont'l Trend Res., Inc. v. OXY USA, Inc.*,
   101 F.3d 634, 641 (10th Cir. 1996) .....................................................6

*Cote v. Philip Morris USA, Inc.*,
   985 F.3d 840 (11th Cir. 2021) .........................................................3, 5

*Daniel v. Am. Optical Corp.*,
   304 S.E.2d 383 (Ga. 1983) ................................................................31

*EEOC v. W&O, Inc.*,
   213 F.3d 600 (11th Cir. 2000) .................................................4, 14, 15

*Ford v. Uniroyal Goodrich Tire Co.*,
   476 S.E.2d 565 (Gla. 1996) ...............................................................19

*Frey v. Bayer Corp.*,
   2020 WL 5995587 (M.D. Ga. Oct. 9, 2020) ......................................27

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*,
   348 S.W.3d 729 (Ky. 2011)..........................................................21, 26

*Goldsmith v. Bagby Elevator Co.*,
  513 F.3d 1261 (11th Cir. 2008) ...............................................................4, 13, 14

*In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*,
  2018 WL 2765961 (N.D. Ga. June 8, 2018)..................................................24, 25

*In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*,
  MDL No. 4:08-MD-2004 (CDL), 2010 WL 1998166 (M.D. Ga.
  May 10, 2010)................................................................................................18

*In re Mentor Corp. Obtape Transobturator Sling Products Liab.
  Litig.*,
  MDL No. 4:08-MD-2004 (CDL), 2016 WL 6393589 (M.D. Ga.
  Oct. 25, 2016) ...............................................................................................18

*Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*,
  181 F.3d 446 (3rd Cir. 1999) ...........................................................................6

*Johansen v. Combustion Eng'g, Inc.*,
  170 F.3d 1320 (11th Cir. 1999) ........................................................................2

*Kemp v. Am. Tel. & Tel. Co.*,
  393 F.3d 1354 (11th Cir. 2004) ................................................................4, 5, 15

*Kerrivan v. R.J. Reynolds Tobacco Co.*,
  953 F.3d 1196 (11th Cir. 2020) ...............................................................3, 5, 6

*Ky. Laborers Dist. Council Health & Welfare Trust Fund v. Hill &
  Knowlton, Inc.*,
  24 F. Supp. 2d 755 (W.D. Ky. 1998)................................................................23

*Liberty Nat'l Life Ins. Co. v. Beasley*,
  466 So. 2d 935 (Ala. 1985)...........................................................................17

*M.H.D. v. Westminster Schs.*,
  172 F.3d 797 (11th Cir. 1999) ........................................................................31

*Mack Trucks, Inc. v. Conkle*,
  436 S.E.2d 635 (Ga. 1993) ............................................................................19

*McBride v. Gen. Motors Corp.*,
  737 F. Supp. 1563 (M.D. Ga. 1990) .................................................................19

iii

*McCabe v. Daimler AG*,
  160 F. Supp. 3d 1337 (N.D. Ga. 2015) ................................................................. 26

*Morales-Arcadio v. Shannon Produce Farms, Inc*.,
  2017 WL 2106188 (S.D. Ga. July 18, 2007) ......................................................... 22

*Next Century Commc'ns Corp. v. Ellis*,
  318 F.3d 1023 (11th Cir. 2003) ................................................................... 21, 24

*Paws Holdings LLC v. Daikin Indus. Ltd.*,
  2017 WL 706624 (S.D. Ga. Feb. 22, 2017) ...................................................... 28, 29

*Sheffield v. Darby*,
  535 S.E.2d 776 (Ga. Ct. App. 2000) ..................................................................... 27

*Simmons v. Sonyika*,
  614 S.E.2d 27 (Ga. 2005) ..................................................................................... 30

*State Farm Mut. Auto Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) .......................................................................................... 3, 5

*State v. Moseley*,
  436 S.E.2d 632 (Ga. 1993) ................................................................................... 19

*Telecom Acquisition Corp., I, LLC v. Int'l Housing Dev. Grp., Corp.*,
  2008 WL 11452482 (D. Nev. Aug. 4, 2008) ......................................................... 18

*Todd v. Martinez Paint & Body, Inc*.,
  517 S.E.2d 844 (Ga. 1999) ................................................................................... 23

*Wheeler v. Novartis Pharm. Corp.*,
  944 F. Supp. 2d 1344 (S.D. Ga. 2013) ................................................................. 27

*Williams v. Dresser Indus., Inc*.,
  120 F.3d 1163 (11th Cir. 1997) ....................................................................... 26, 27

*Williams v. First Advantage LNS Screening Solutions, Inc.*,
  947 F.3d 735 (11th Cir. 2020) ................................................ 1, 3, 5, 6, 14, 15, 16

## Statutes

Fla. Stat. § 627.428 ................................................................................................. 17

Fla. Stat. § 768.79 ................................................................................................... 17

Ga. Code Ann. § 9-3-33 ...................................................................................30

Ga. Code Ann. § 11-2-313(2) .........................................................................27

Ga. Code Ann. § 23-2-53 ...............................................................................26

Ga. Code. Ann § 51-1-11(b)(2) ......................................................................29

Ga. Code Ann. § 51-1-11(c) ...........................................................................30

Ga. Code. Ann. § 51-12-5.1(e)(1) ...................................................................16

Ga. Code. Ann. § 51-12-5.1(e)(2) ...................................................................19

RICO ................................................................................................................4

Servicemembers' Civil Relief Act, 50 U.S.C. § 3936(a)..................................30

**Rules**

Rule 50 ........................................................................................................2, 19

Rule 59 .............................................................................................................2

Rule 59(e).......................................................................................................19

**Other Authorities**

Fourteenth Amendment ...............................................................................2, 32

# I. THE PUNITIVE DAMAGES AWARDS ARE UNCONSTITUTIONAL

## A. Introduction

In the first consolidated bellwether trial, the jury awarded compensatory and punitive damages to all three plaintiffs. For Mr. Estes, the jury awarded $350,500 in compensatory damages and $2,100,000 in punitive damages. 4/30/2021 Trial Tr. at 13:3-12. Mr. Hacker was awarded $160,000 in compensatory damages and $2,100,000 in punitive damages. *Id.* at 15:24-16:4. Finally, the jury awarded Mr. Keefer $320,000 in compensatory damages and (yet again) $2,100,000 in punitive damages. *Id.* at 14:17-15:1. These punitive damage awards are unconstitutionally excessive, especially when considering Defendants' conduct and the ratio between compensatory and punitive damages. "As the Supreme Court has noted, a punitive damages award can be so out of whack that it screams a violation of due process[.]" *Williams v. First Advantage LNS Screening Solutions, Inc.*, 947 F.3d 735, 762 (11th Cir. 2020). So is the case here; thus, reductions are necessary. Given the sizeable compensatory award damages, Defendants argue that a ratio of 1:1 is warranted. However, at a minimum, the Court should reduce each punitive damages award to no more than four times the respective compensatory damages award.[1]

---

[1] Defendants also move to limit Mr. Estes and Mr. Keefer to a single punitive damages award under Georgia law. *See infra* Section II. Should the Court hold otherwise, both punitive damages awards should still be reduced for the foregoing reasons.

1

The Eleventh Circuit has made clear that a district court's reduction of excessive punitive damages is "not a remittitur at all." *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331 (11th Cir. 1999). "Unlike a remittitur, which is discretionary with the court and which we review for an abuse of discretion, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." *Id.* (internal citations omitted). The court need not obtain the consent of the plaintiff in reducing an award of punitive damages. *Id.* ("Plaintiff's consent is irrelevant if the Constitution requires the reduction."). Thus, the court's power to reduce a punitive damages award is rooted in Rule 50, not Rule 59, of the Federal Rules of Civil Procedure. *Id.*

### B.    Legal Standard

"The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). To assist courts in evaluating the constitutionality of punitive damages awards, the Supreme Court has proffered a number of "guideposts." The first and most important is the "degree of reprehensibility of the defendant's conduct." *Id.* at 575. The Court has further elucidated five factors that may be considered when assessing reprehensibility: (1) whether the harm was physical rather than economic; (2) whether the conduct showed a reckless disregard of health and safety; (3) whether the target of the conduct was financially vulnerable;

(4) whether the conduct was repeated or was an isolated incident; and (5) whether the harm was accidental or the result of intentional malice. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The second guidepost is the ratio between the amount of compensatory damages to punitive damages. *Gore*, 517 U.S. at 581. While the Supreme Court has refused to adopt a bright-line ratio at which point punitive damages are excessive, it has offered some suggestions. *Campbell*, 538 U.S. at 425. Specifically, it has held that "few awards exceeding a single-digit ratio…will satisfy due process," and that "an award of more than four times that amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* The Eleventh Circuit has held similarly based on its interpretation of the jurisprudence of the Supreme Court and other Circuit Courts of Appeals. Just last year, it explained, "[W]e will operate under the assumption that a 4:1 ratio is the Court's suggested default guideline[.]" *Williams*, 947 F.3d at 755. Numerous opinions from the Eleventh Circuit reflect this conclusion. *See, e.g., Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 849 (11th Cir. 2021) (finding ratio of 3.3:1 to be constitutional); *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1210 (11th Cir. 2020) (holding ratio of 1.6:1 to be permissible); *Williams*, 947 F.3d at 765-66 (reducing punitive damages from ratio of 13:1 to 4:1); *Bogle v. McClure*, 332 F.3d 1347, 1361-62 (11th Cir. 2003) (finding ratio of approximately 4:1 to be reasonable).

In those instances in which the Eleventh Circuit has allowed a ratio to exceed 4:1, it is because the compensatory damages were very low and/or the defendant's conduct was discriminatory, harassing, or persisted even in the face of litigation. For example, the court upheld an aggregate ratio of 8.3:1 in a case in which the compensatory damages among three plaintiffs totaled just over $36,000 and where the plaintiffs, all pregnant women, were subjected to a discriminatory employment policy and disparaging comments from their supervisors. *See EEOC v. W&O, Inc.*, 213 F.3d 600, 612, 616-17 (11th Cir. 2000). Similarly, the Eleventh Circuit found that a ratio of 9.2:1 was constitutional where the compensatory damages were only $54,231 and the defendants were recklessly indifferent to the plaintiff's federal civil rights and subjected him to a pattern of racially motivated discrimination. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1282-83 (11th Cir. 2008). However, limitations still exist. Thus, in a case in which AT&T was found to have violated both state and federal RICO statutes and where compensatory damages were only $115, the Eleventh Circuit reduced the punitive damages from $1 million to $250,000 as to prevent "an unconstitutional windfall." *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1365 (11th Cir. 2004).

Where compensatory damages are large, both the Supreme Court and the Eleventh Circuit have found that a ratio closer to 1:1 may be necessary. *See Campbell*, 538 U.S. at 425 ("When compensatory damages are substantial, then a

lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."); *Williams*, 947 F.3d at 754-55 ("If…the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and punitive damages award that exceeds that ratio will be suspect."). For example, the court upheld a ratio of 1.6:1 in a tobacco case in which the compensatory damages were $15.8 million. *Kerrivan*, 953 F.3d at 1209-10.

The last indicium is a comparison between punitive damages and civil or criminal penalties that could be imposed for similar conduct. *Gore*, 517 U.S. at 583. However, in many cases since *Gore*, the Eleventh Circuit has noted that this guidepost carries less weight than reprehensibility and the ratio of compensatory to punitive damages. *See Cote*, 985 F.3d at 850; *Kemp*, 393 F.3d at 1364-65.

As the term "guideposts" would suggest, any evaluation of the reasonableness of a punitive damages award will necessarily be factually intensive. *Williams,* 947 F.3d at 762. While this analysis can at times lack precision, the case law offer some guardrails, especially compared to "juries [who] are often left to pick a number out of the sky, tethered to nothing more than than the jury's emotional reaction to the misdeed of a corporation with deep pockets." *Id.*

**C.    Argument**

Applying *Gore*, *Campbell* and case law of the Eleventh Circuit to the facts of this case demonstrates why the Court should reduce the three present punitive damages awards.    Defendants focus on the first two *Gore* guideposts (reprehensibility and ratio) as the third (civil penalties authorized or imposed in similar cases) is inapplicable given Plaintiffs' particular claims.   As at least two Courts of Appeals have noted, "a violation of common law torts duties may not lend itself to a comparison with statutory penalties."   *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 468 (3rd Cir. 1999) (citing *Cont'l Trend Res., Inc. v. OXY USA, Inc.*, 101 F.3d 634, 641 (10th Cir. 1996) (internal quotations omitted). The Eleventh Circuit has followed suit in at least one products liability case involving punitive damages, wherein the court only discussed statutory penalties for a claim of unfair trade practices but disregarded this factor for the common law tort claims.  *See Kerrivan*, 953 F.3d at 1210-11.

**1.    Defendants' Conduct Was Not Reprehensible**

Without question, the most important guidepost in evaluating the reasonableness of a punitive damages award is the reprehensibility of the defendant's conduct.   *Gore*, 517 U.S. at 575-75; *Williams*, 947 F.3d at 750-51. While Defendants contest the verdicts on numerous grounds, uncontroverted evidence presented at trial demonstrates that even if the CAEv2 was defective

Defendants' conduct was not so reprehensible as to justify these substantial punitive damages awards.

Aearo developed the CAEv2 to help solve a unique military problem. *See* 4/20/2021 Trial Tr. at 202:21-203:12. Servicemembers historically have suffered from high rates of hearing loss given their tendency not to wear hearing protection for fear of not being able to hear commands or the enemy. *See id*; *see also* 4/28/2021 Trial Tr. at 112:13-25. Thus, Aearo developed the dual-ended CAEv2 to allow soldiers to hear in quiet environments but provide protection for sudden impulse sounds while using the nonlinear plug, as well as provide traditional steady-state noise protection with the linear end. *See* 4/20/2021 Trial Tr. at 202:21-203:12, 207:20-210:11. This was a major improvement over the status quo. As one of the Army researchers involved in the early development of a nonlinear earplug noted, the "alternative" at the time of the CAEv2's introduction was for soldiers "not to wear hearing protection." S-Gen-101 at 10.

The military was involved in the development of the CAEv2. In late 1997, after independently researching the performance of a nonlinear filter designed by the French-German Research Institute of Saint-Louis ("ISL"), the Army asked Aearo to develop a dual-ended earplug containing the ISL filter. S-Gen-0108. Months later, Aearo provided samples. *See* S-Gen-103. Approximately a year thereafter, Doug Ohlin, then Chairman of the Department of Defense Hearing Conservation Working

Group, requested that the earplugs be shortened by approximately 1/4" so that they could fit the military's standard earplug case and to ensure there would be no interference with a soldier's helmet chinstrap.  *See* D-Gen-1806; P-Gen-311.  Aearo then shortened the plug as requested, to ensure that the CAEv2 met the military's operational needs.  4/20/2021 Trial Tr. at 287:7-16.

Aearo thereafter received a stream of positive feedback about the CAEv2 from the military.  For example, in February 2000, very soon after the first sales of the product, Robert Bosanko of the Army sent Brian Myers the results of a survey of soldiers who had used the product.  *See* P-Gen-782 at 1.  He reported that "the unit was very happy with how they worked."  *Id*.  Similarly, in 2004, LTC Lorraine Babeu conducted another field study of the CAEv2.  *See* S-Gen-109.  She reported no issues with the product, and shared her results with Elliott Berger at Aearo.  *See* P-Gen-0683.  Other operational feedback was similarly positive.  In July 2004, Brigadier General William Cato of the Marines wrote to a supplier of the CAEv2, "The swift delivery of your combat arms earplugs has *greatly enhanced* Marines' comfort and survivability in combat zones."  *See* P-Gen-593 (emphasis added).  A soldier deployed to Iraq also noted, "Combat Arms earplugs work great in this environment.  They probably made the difference between hearing damage and not.  They definitely allow you to mentally recover very quickly so you are able to deal

with your situation versus standing around like a stunned mullet."  P-Gen-2962 at 29.

Similar positive feedback is reflected in official military documents related to the Army Hearing Program.  For example, the 2008 Special Text describes that "[w]ith the influx of Soldiers experiencing hearing loss in Iraq, once reluctant Soldiers began seeing the need for hearing protection while dismounted."  S-Keefer-39 at 9.  Discussing the use of the CAEv2 in particular, the Special Text states that "[a]s reported by audiologists who served in Iraq, no Soldier seen at the CSH that reported wearing the CAE when exposed to an explosion had ruptured eardrums." *Id.* at 37; *see also* 4/28/21 Trial Tr. at 58:15-61:1 (LTC Fallon testimony re same).

Additionally, military audiologists testified about the effectiveness of the CAEv2 based on their personal and professional experiences.  For example, LTC Battler testified that of the thousands of soldiers she fit and trained the plug with, "not one" complained that the CAEv2 did not provide adequate protection. 4/22/2021 Trial Tr. at 172:23-173:2.  Contrary to this positive feedback from military records, military audiologists, and frontline soldiers, Plaintiffs presented no evidence that the plugs did not protect individuals whom the product properly fit.

Military REAT testing also found that the CAEv2 provided "very good attenuation," *see* D-Gen-628 at 30, and that the CAEv2 outperformed earplugs that Plaintiffs now claim are superior products.  *See* P-Gen-5843.  In 2005, in response

to an inquiry from Brian Myers, Dr. Ohlin stated in an email, "Yes, I think you can say the combat arms earplug has be (sic) 'evaluated and specified by the U.S. Armed Forces.'"  D-Gen-272 at 1.  It was entirely reasonable (and not reprehensible) for Defendants to rely on this positive feedback from the military, which had at least as much capacity to test the CAEv2 as Defendants, and a much greater ability to observe its real-world performance.

Plaintiffs repeatedly referred to the "secret" Flange Memo, but the flange-fold fitting technique was no secret at all.  First, Aearo placed the tip on the consumer packaging of the product and provided this packaging to the military.  *See* S-Gen-83 (consumer packaging with flange fold instructions); *see also* S-Gen-85 (letter from Elliott Berger to Major Mark Little).   Second, numerous military audiologists testified at trial that they were aware of the flange-fold technique.  *See* 4/20/2021 Trial Tr. at 140:6-142:2 (LTC Merkley); 4/27/2021 Trial Tr. at 305:1-10 (LTC Fallon).   LTC Fallon, the former Program Manager of the Army Hearing Conversation Program, testified that not only was he aware of the flange fold, he taught numerous Army hearing technicians about it annually over his seven years at CHPPM.  *See* 4/27/2021 Trial Tr. at 325:2-22.  Third, Aearo provided the military with the reports from the 016 and 017 labeling tests.  *See* S-Gen-0008 (letter from Mr. Berger to Major Little); *see also* S-Gen-17 (213017 test results); P-Gen-384 (213016 test results).  The 017 test results stated that "[t]he yellow flanges were

folded outward to allow a deeper insertion of the green plug." S-Gen-17 at 3. Finally, the instructions for the CAEv2 drafted by CHPPM (the wallet card) contain a picture of the CAEv2 with the opposite-end flanges folded back. S-Gen-71.

Relatedly, despite Plaintiffs' assertions to the contrary, there was nothing improper about stopping the 015 test. Doing so did not violate any applicable standards or regulations, and indeed was warranted given the unexpected variability in the results. *See* 4/20/2021 Trial Tr. at 174:18-22, 275:12-24, 276:25-277:9; *see also* 4/27/2021 Trial Tr. at 123:5-124:18 ("There is no prohibition in the standard or, for that matter, anywhere else that I know of about stopping a test."); *see also id.* at 214:3-18 ("…it's common to do partial studies, especially when you're learning something about earplugs...").

Plaintiffs also attempted to malign Defendants for not providing instructions with each CAEv2 sold to the military. However, Defendants' conduct on this point was entirely reasonable. First, the military informed Aearo that it did not want instructions because it wanted to keep costs down and intended to train soldiers in person. *See* S-Gen-1; 4/28/2021 Trial Tr. at 122:23-123:5. Second, as noted above, Aearo provided the instructions on its consumer packaging to the military. *See* S-Gen-85. Defendants also sold commercial packages of the CAEv2, complete with instructions, in retail stores on Army bases—indeed, Mr. Hacker purchased one of these commercial packages—so Aearo was clearly willing to provide soldiers with

individual instructions to soldiers when the method of packaging allowed for it. Third, the military drafted its own instructions on the product in the form of a wallet card. *See* S-Gen-71 (wallet card); S-Gen-24 (CHPPM emails regarding draft of the wallet card). LTC Fallon testified that he provided these cards to hearing technicians during training sessions, *see* 4/28/2021 Trial Tr. at 44:16-45:3, and LTC Battler testified that she made the cards available to soldiers after fitting them with the plug. *See* 4/22/2021 Trial Tr. at 184:19-185:8. Defendants did not behave reprehensibly by deciding not to duplicate written instructions, which the military did not want or need, in its bulk shipments of the CAEv2. Fourth, it was reasonable for Defendants to rely on the military to adequately train and fit servicemembers with the earplugs. Department of Defense policy mandated that medically trained personnel fit all preformed earplugs and that servicemembers' fits be checked annually, and the Army had its own policy mandating the same. *See* S-Gen-3 at 8 (DoD Instruction 6055.1); S-Gen-69 at 6 (DA PAM 40-501).

Turning to the factors of reprehensibility proffered in *Campbell*, Defendants acknowledge that Plaintiffs have alleged harm that is physical and not economic. However, the remaining four factors lie in Defendants' favor. First, Defendants did not show a reckless disregard for the health and safety of others. Quite the opposite—Defendants were working with the military to *protect* the hearing of servicemembers, and a large body of testing and military feedback supported

Defendants' view that the  CAEv2 was doing just that.  Second, the United States government is the least "financially vulnerable" entity in the world.   Third, Defendants' conduct cannot be seen as "repeated actions," but instead reflects an arc from the military's initial desire for the product, to the CAEv2's design, testing, and sales, and ultimately its eclipse by superior products.  And finally, Defendants did not act with "intentional malice, trickery, or deceit."  They disclosed the findings recorded in the Flange Memo—that some users would benefit from folding back the opposing flanges before insertion—and years' worth of military testing and testimonials confirmed to Defendants that the product was working as intended.

Viewed in totality, the evidence demonstrates that Defendants' conduct here was reasonable and is nowhere near the degree of reprehensibility seen in other punitive damages cases in the Eleventh Circuit.  *See, e.g., Goldsmith*, 513 F.3d at 1283-84 (intentional racial discrimination, including racial slurs); *Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1319 (defendant "continued its course of action and inaction undeterred by both the prospect and reality of litigation"); *Bogle*, 332 F.3d at 1361-62 (intentional racial discrimination and attempt to cover it up); *W&O*, 213 F.3d at 607-09, 614-15 (intentional discrimination, including disparaging comments, against pregnant women).

### 2.    The Ratio of Compensatory to Punitive Damages is "Out of Whack"

The jury awarded each plaintiff $2.1 million in punitive damages. 4/30/2021 Trial Tr. at 13:11-12, 14:25-15:1, 16:3-4. In comparing these to their respective compensatory damages awards, Mr. Estes' punitive to compensatory damages ratio was **5.99:1**, Mr. Hacker was **13.13:1** and Mr. Keefer was **6.56:1**. While Mr. Hacker's ratio readily stands out as more than double that of the other two plaintiffs, and well over the single-digit marker laid by the Supreme Court in *Campbell*, all three ratios are impermissibly high.

The Eleventh Circuit looks to a ratio of 4:1 as a baseline. *See Williams*, 947 F.3d at 755. Thus, out of the gate, all three awards are excessive. Thereafter, the Eleventh Circuit has instructed courts look to the amount of the compensatory damages award, as "a higher ratio is supportable if the amount of compensatory damages is low." *Id.* at 755-56. Here, the compensatory awards were substantial. *See, e.g., id.* at 755 ("[H]ere the compensatory damages award of $250,000 was clearly not a small amount of money[.]"). This becomes more apparent when comparing the compensatory damages awards here to cases in which the Eleventh Circuit deemed a ratio of greater than 4:1 to be constitutional. *See Goldsmith*, 513 F.3d at 1283-85 (9:1 ratio constitutional where compensatory damages were $54,000); *Kemp*, 393 F.3d at 1363-65 ($250,000 punitive damages award reasonable where compensatory damages were only $115); *W&O*, 213 F.3d at 616-617 (8.3:1

14

permissible where total compensatory damages for three plaintiffs was less than $40,000). In those cases where compensatory damages were near $250,000, as in *Williams* and as here, the Eleventh Circuit has approved of "ratios that were within or close to the 4:1 ratio[.]" *Id.* at 758.

Other circuits have held similarly. As noted in a survey of cases in *Williams*, in 17 cases from other circuits in which the damages ratio exceeded 10:1, judgments were affirmed only 8 times, all in cases where the compensatory damages award were smaller than *Williams* or here. *Id.* at 759-60. Of the nine cases in which the appellate court deemed the punitive damages award to be excessive, seven were "remanded for remittitur to a ratio of 4:1 or less." *Id.* at 760. Looking specifically at the amount of compensatory damages in *Williams* (which is similar to the present awards) as compared to cases from other circuits, the Eleventh Circuit found that of 15 cases where compensatory damages ranged from $200,000-$300,000, the punitive awards were upheld in nine cases and vacated in six. *Id.* at 760. Of the nine upheld, only two had a ratio greater than 2:1. *Id.* at 761.

Thus, in reviewing the case law of the Eleventh Circuit and other Courts of Appeals, it is readily apparent that the current ratios cannot stand. The compensatory damages awards here were substantial and Defendants' conduct was nowhere near as reprehensible as those cases in which a ratio of greater than 4:1 was justified. In nearly every similar case, Courts of Appeals across the country have demanded

ratios no greater than 4:1, and often time something closer 2:1.  So too here should the Court reduce the punitive damages awards to no greater than four times compensatory damages.  The present awards are "out of whack" and are "tethered to nothing more than the jury's emotional reaction to the misdeed of a corporation with deep pockets."  *See id.* at 762.

## II.   <u>GEORGIA PERMITS ONLY ONE PUNITIVE DAMAGES AWARD</u>

At the charge conference, over Defendants' objection, the Court agreed to allow both Mr. Estes and Mr. Keefer to pursue claims for punitive damages against Defendants, and the jury issued awards in favor of both.  Yet, Georgia law provides that, "[o]nly one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission."   Ga. Code. Ann. § 51-12-5.1(e)(1).   Thus, Georgia law—which Plaintiffs advocated to apply to this case—precludes both from recovering punitive damages.

At the charge conference, Plaintiffs' counsel seized upon the language "in a court in this state" and argued that this portion of the statute did not apply here. 4/27/2021 Tr. at 386-87.  Defendants have not located a case outside of Georgia applying (or declining to apply) this precise provision.  Still, the provision sets forth an unequivocal Georgia legislative policy to eliminate repetitive punitive damages

claims based upon defects in the same product. It would thwart the obvious purpose of the policy—and would make little sense—for application of this public policy to depend upon where a lawsuit is filed. Indeed, it would encourage forum-shopping.

Further, while there are no out-of-state cases addressing this particular Georgia statute, there are cases applying analogous Florida statutes containing similar language outside of Florida. For example, at least two non-Florida courts have held that attorney's fees can be awarded under § 627.428, Fla. Stat., even though it applies only to judgments rendered "by any of the courts of this state." *See Carr v. American Universal Ins. Co.*, 341 F.2d 220, 224-225 (6th Cir. 1965) (holding that Tennessee district court should have awarded fees under the Florida statute since the substantive law of Florida applied to a case transferred from Florida); *Liberty Nat'l Life Ins. Co. v. Beasley*, 466 So. 2d 935, 937 (Ala. 1985) (rejecting argument that the term "courts of this state" precluded an Alabama court from awarding fees under the statute). Similarly, at least two non-Florida federal district courts have awarded attorney's fees under § 768.79, Fla. Stat.—including one MDL court— despite language in that statute purportedly limiting its application to "any civil action for damages filed in the courts of this state." *See In re Mentor Corp. Obtape Transobturator Sling Products Liab. Litig.*, MDL No. 4:08-MD-2004 (CDL), 2016 WL 6393589 (M.D. Ga. Oct. 25, 2016) (awarding attorney's fees); *Telecom Acquisition Corp., I, LLC v. Int'l Housing Dev. Grp., Corp.*, 2008 WL 11452482, at

17

*2 (D. Nev. Aug. 4, 2008) (awarding attorney's fees under the statute since Florida substantive law applied to the case).

In short, because Plaintiffs asked the Court to apply Georgia's substantive laws to their claims, they should not be allowed to escape the limitations imposed by that same law on the recovery of punitive damages.  For that reason, Mr. Estes and Mr. Keefer may not *both* retain their awards of punitive damages in this case. Instead, they are entitled (at most) to "a single award of punitive damages . . . to share jointly."  *See In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, MDL No. 4:08-MD-2004 (CDL), 2010 WL 1998166 (M.D. Ga. May 10, 2010) (emphasis added) (permitting multiple plaintiffs in consolidated trial to recover and share a single award of punitive damages).  Thus, Plaintiffs Estes and Keefer should be required to share the single award of $2.1 million for punitive damages if the award itself is upheld in its current amount; if the awards are reduced—as they should be—they would be entitled to share the single reduced award.

Finally, in addition to sharing a single award, the judgments, at a minimum, should be amended under Rule 59(e).  Under the same punitive damages statute, the Georgia legislature decreed that "[s]eventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge,

shall be paid into the treasury of the state through the Office of the State Treasurer."

Ga. Code. Ann. § 51-12-5.1(e)(2).  This subsection does not contain the phrase "a

court in this state," and has expressly been applied by courts outside of Georgia.  *See*

*Cisson v. C.R. Bard, Inc*., 2015 WL 251437, at *2-5 (S.D. W.Va. Jan. 20, 2015).[2]

Thus, the judgments should be amended to reflect that the majority of any award

must be paid to the State of Georgia and not to the individual Plaintiffs.

## III.   DEFENDANTS RENEW AND PRESERVE THE RULE 50 MOTIONS MADE AT THE CONCLUSION OF PLAINTIFFS' CASE-IN-CHIEF

Defendants raised a number of motions for judgment as a matter of law during

trial following the conclusion of Plaintiff's case.  4/26/2021 Tr. at 347-95.  The Court

issued an order denying all of these motions.  *See*, *e.g*., *Estes*, Case No. 7:20-cv-137,

Dtk. 175.  Instead of rearguing these motions in full, Defendants renew the motions

in summary form as follows:

### A.   Causation

As a threshold matter, to recover on any of their claims, Plaintiffs must

establish that the CAEv2 was a legal cause of their alleged hearing or tinnitus

---

[2] As the district court noted in *Cisson*, a Georgia federal district court ruled that this portion of the statute was unconstitutional in *McBride v. Gen. Motors Corp.*, 737 F. Supp. 1563 (M.D. Ga. 1990), but no other court has followed the holding in *McBride* in the three decades since it was decided.  Instead, three later Georgia cases found the statute to be constitutional, as did the *Cisson* court just six years ago.  *See Mack Trucks, Inc. v. Conkl*e, 436 S.E.2d 635 (Ga. 1993); *State v. Moseley*, 436 S.E.2d 632 (Ga. 1993); *Ford v. Uniroyal Goodrich Tire Co*., 476 S.E.2d 565 (Gla. 1996).

difficulties.  Yet, even assuming Plaintiffs presented sufficient evidence of defects in the CAEv2, they failed to offer expert testimony that these alleged defects affected *their own* use of the product so that it could have caused *their own* alleged injuries. Plaintiffs' theory is that the CAEv2 was designed in a manner that "prevented Plaintiffs from obtaining a proper fit and seal when inserting the device into their ear canals."  Master Long Form Complaint, MDL Dkt. 704 ¶ 6.  Yet no one—expert or otherwise—testified that the CAEv2 did not fit these three Plaintiffs, much less that the alleged defects in the earplug prevented the Plaintiffs from getting a good fit.

The undisputed evidence at trial demonstrated that (a) the CAEv2 fit and worked for many or most users, *see* 4/22/2021 Trial Tr. at 182:8-12, and (b) all pre-formed earplugs can become loose over time from routine jaw movements.  *See* 4/27/2021 Trial Tr. at 325:11-22.  So, to establish that a defect in the CAEv2 caused injuries to these three Plaintiffs, they would have to establish that the CAEv2 did not fit them specifically.  But none of their experts attempted to professionally fit or test how the CAEv2 fit these three Plaintiffs.

Instead of trying to fit these Plaintiffs, their experts simply assumed that the CAEv2 did not fit them properly because they allegedly suffer today from hearing loss or tinnitus.  This is classic circular reasoning:  the CAEv2 must have caused their injuries because it did not fit them, and it must not have fit them because it caused their injuries.  But a Plaintiff cannot establish causation with assumptions or

circular reasoning.  Because Plaintiffs did not meet their burden of proving that defects in the CAEv2 actually caused their alleged injuries, Defendants are entitled to judgment as a matter of law.

### B. Plaintiffs' Negligent Misrepresentation, Fraudulent Misrepresentation, and Fraud and Deceit Claims Fail as a Matter of Law.

Defendants are entitled to judgment as a matter of law on Plaintiffs' claims for negligent misrepresentation (Count VII), fraudulent misrepresentation (Count VIII) and fraud and deceit (Count X) because Plaintiffs presented no evidence that they justifiably or reasonably relied on any affirmative misrepresentations by the Defendants.  *See Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1030 (11th Cir. 2003) (per curiam) (noting that reasonable reliance is an essential element of claims for fraudulent and negligent misrepresentation under Georgia law); *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011) (holding that fraud through misrepresentation requires proving that the defendant made a material misrepresentation and that "the plaintiff reasonably relied upon the misrepresentation").

Plaintiffs cannot satisfy their burden by asserting that they relied on the military's decision to purchase the CAEv2, and the misrepresentations from the Defendants caused the military to believe the CAEv2 were safe.  "[T]o show a third-party fraud claim in Georgia, the plaintiff must provide record evidence that … the

defendant's objective was to defraud the plaintiff." *Morales-Arcadio v. Shannon Produce Farms, Inc.*, 2017 WL 2106188, at *26 (S.D. Ga. July 18, 2007) (citing *Fla. Rock & Tank Lines, Inc.*, *v. Moore,* 365 S.E.2d 836, 837 (Ga. 1988)).   Plaintiffs presented no evidence that, when Aearo or 3M made alleged misrepresentations to the military, they had the objective of defrauding individual soldiers.   At most, Plaintiffs presented evidence that Defendants intended to defraud the military itself, which actually purchased the earplugs.   That does not suffice to state a third-party fraud claim.  *See id*. (granting summary judgment because "[t]he evidence proffered by the [plaintiffs] shows at most that [the defendant] intended to defraud the Government" and plaintiffs "present no evidence that [the defendant's] purpose was to defraud [the plaintiffs]").   Because Plaintiffs cannot show that the Defendants intended to defraud individual soldiers when they made alleged misrepresentations *to the military*, they must identify misrepresentations Defendants made *to soldiers*, and on which Plaintiffs relied, to make out a fraud or misrepresentation claim under Georgia law.

Mr. Hacker's allegation that he relied on the military's purchasing decision also will not salvage his fraud and misrepresentation claims under Kentucky law.   In Kentucky, a plaintiff whom the defendant did not intend to defraud cannot bring a fraud or misrepresentation claim unless he actually received and relied on the alleged misrepresentation.  *See Ky. Laborers Dist. Council Health & Welfare Trust Fund v.*

*Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 771 (W.D. Ky. 1998) ("Kentucky courts have long held that a third party not the target of an alleged tortfeasor's deceptions may state a claim for deceit so long as it was reasonably foreseeable *that he would receive and potentially act on them*.") (emphasis added). Where there is an "utter lack of allegations or proof that the statements upon which [the plaintiff] bases its claim were made to it, and/or its reliance upon said misrepresentations," as here, a fraud or misrepresentation claim fails as a matter of law. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1090 (W.D. Ky. 1995).

Critically, not every statement or assertion—even if false—will support a claim for fraud or misrepresentation. Instead, "a party is not justified in relying on and assuming to be true representations consisting of mere expressions of opinion, hope, expectation, puffing, and the like; rather, representations of this nature must be inquired into and examined to ascertain the truth." *Todd v. Martinez Paint & Body, Inc.*, 517 S.E.2d 844, 846 (Ga. 1999); *accord Next Century*, 318 F.3d at 1028. Here, Plaintiffs have failed to introduce any evidence of justifiable reliance to support their fraud and misrepresentation claims.

### 1. Mr. Estes Did Not Establish Justifiable Reliance.

During his trial testimony, Mr. Estes could only point to a single affirmative statement from Defendants that he allegedly relied upon in deciding to wear the CAEv2: a poster in his barracks with the words "You Protect Us, We Protect You."

4/5/2021 Tr. at 105:7-106:20.  That statement is a textbook example of "puffery" that cannot support his fraud or misrepresentation claims.  *See Next Century*, 318 F.3d . at 1027-28 (holding that CEO's statement touting company's "strong performance" constituted puffery that would not support fraud claim); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2018 WL 2765961, at *8 (N.D. Ga. June 8, 2018) (statement in "brochure describing Shingles as 'quality' shingles that would hold up well" was puffery that could not support fraud claim).

### 2.    Mr. Keefer Did Not Establish Justifiable Reliance.

Mr. Keefer's fraud and misrepresentation claims fare no better.  In fact, the only statement Mr. Keefer claims to have relied upon was a statement made by an unidentified civilian Department of Defense employee regarding the CAEv2:  "Wear them or go deaf."  4/7/2021 Tr. at 77:5-19.  Not only is there no evidence that the source of that statement was one of the Defendants, but the statement itself is classic hyperbole and puffery.  *See Atlas Roofing*, 2018 WL 2765961, at *8.  Further, Mr. Keefer is not deaf and does not claim to be, so there is no link between that statement and his current complaints.

### 3.    Mr. Hacker Did Not Establish Justifiable Reliance.

Mr. Hacker's fraud and misrepresentation claims fail for the same reason.  Mr. Hacker testified that he received written information about the CAEv2 when he purchased his own pair on an army base in 2006.  4/14/2021 Tr. at 104:9-105:11.

While Mr. Hacker no longer possesses the package or materials that came with his CAEv2, he testified that he "would have read over it[.]" *Id.* at 105:10.  During cross examination, he identified a 2007 package insert as containing the same type of information that he "would have read" with his own purchase.  *Id.* at 156:24-164:4. Critically, at no point did Mr. Hacker state or imply that he relied upon this material in his decision to purchase or to wear the CAEv2—likely because he testified that he was already using the CAEv2 before he purchased his own pair.  Further, he did not identify a single statement in that written material that he contends was false, and to the extent he suggests that the NRR on the packaging was false, he testified at trial that he did not know what an NRR was when he was serving in the military, *id.* at 159:21-160:2, so he could not have "reasonably relied" upon the NRR rating on the label in his decision to use the CAEv2.  Thus, Mr. Hacker failed to establish an essential element of his misrepresentation claims as a matter of law.

### C.    Plaintiff's Fraud by Concealment Claims Fail as a Matter of Law.

Plaintiffs' fraudulent concealment claims (Count IX) also fail as a matter of law.  Under Georgia law, "in a fraudulent concealment action, there must first exist a duty to communicate the omitted or concealed material fact to the defrauded party."  *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1350 (N.D. Ga. 2015).  This requirement is statutory.  Ga. Code Ann. §23-2-53 ("[s]uppression of a material fact which a party is under an *obligation* to communicate constitutes fraud") (emphasis

added).  Section 23-2-53 further provides that "[t]he obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."  *Id*.  Kentucky law also requires a "duty to disclose the material fact" before liability can be imposed for a fraudulent omission.  *Giddings*, 348 S.W.3d at 747.  As the Eleventh Circuit has observed, "[g]enerally, business relationships are not confidential relationships" that would give rise to a duty to disclose.  *Williams v. Dresser Indus., Inc*., 120 F.3d 1163, 1168 (11th Cir. 1997).  Here, none of the Plaintiffs can point to any legal duty Defendants owed to  disclose any material facts to Plaintiffs, with whom they had no relationship at all.  At most, Plaintiffs might contend that Defendants had a duty to disclose information to its customer, the military.  But none of the evidence adduced at trial would support the conclusion that Defendats owed a duty to disclose to individual soldiers like the Plaintiffs, with whom they did not even directly communicate.  *See id.* (reversing denial of motion for judgment as a matter of law where plaintiffs had not introduced evidence to suppor the existence of a duty to disclose).

### D.    Estes' and Keefer's Warranty Claims Fail as a Matter of Law.

Under Georgia law, a party must show privity with the manufacturer of a product to recover on any express or implied warranty claim.  *See Wheeler v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 1344, 1351 (S.D. Ga. 2013).  However, an exception to this requirement exists where a manufacturer extends an express

warranty directly to the ultimate consumer. *Frey v. Bayer Corp.*, 2020 WL 5995587, at *6 (M.D. Ga. Oct. 9, 2020). While express warranties can be created without the use of "formal words such as 'warrant' or 'guarantee[,]'" an "affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." Ga. Code Ann. §11-2-313(2). Thus, Georgia courts have consistently held that "mere expressions of opinion, hope, expectation, puffing, and the like" are non-actionable. *See Sheffield v. Darby*, 535 S.E.2d 776, 779 (Ga. Ct. App. 2000). Federal courts applying Georgia law have held similarly. *See, e.g., Paws Holdings LLC v. Daikin Indus. Ltd.*, 2017 WL 706624, at *15 (S.D. Ga. Feb. 22, 2017) (holding that statements like "reliable operation" and "low cost maintenance and service" were "mere non-actionable puffery").

Mr. Keefer's warranty claims fail for three independent reasons. The sole express warranty to which Mr. Keefer testified was a single statement by "[a] DoD civilian" instructing him and other soldiers during basic training to "[w]ear them or go deaf." *See* 4/7/2021 Tr. at 76:21-77:19. First, this statement cannot satisfy the exception to the privity requirement for the simple fact that it was not made by an agent of Aearo or 3M, and Mr. Keefer presented no other evidence of any warranty or guarantee from Defendants. Second, even if the "wear them or go deaf" statement had been relayed to him by an agent of one of the Defendants, the information in

that statement is puffery.  Third, Mr. Keefer is not deaf, so he cannot prove that Defendants breached the alleged warranty.  Thus, his warranty claims fail as a matter of law.

While Mr. Estes claims to have viewed a statement from 3M, that statement is also nothing more than puffery.  Specifically, Mr. Estes testified that he saw a 3M poster that stated, "You Protect Us, We Protect You."  4/5/2021 Tr. at 105:7-20. This single statement is fundamentally "vague and indefinite…and/or mere non-actionable puffery."  *See Paws Holdings*, 2017 WL 706624 at *15.  As Mr. Estes failed to point to any other statements by 3M or Aearo that could constitute a warranty, his warranty claims fail as a matter of law.

### E.    Negligence per se

Defendants renew their argument that the EPA regulations do not apply to hearing devices sold to the military.  *See* 4/27/2021 Trial Tr. at 363:4-24 (objecting to jury instructions).  But even if they do apply, Plaintiffs failed to establish that any violation of these regulations impacted the decisions by Mr. Estes and Mr. Keefer to use the CAEv2, much less that it caused their alleged injuries.  Both testified that they received proper instructions on the CAEv2 from the military, *see* 4/6/2021 Trial Tr. at 72:12-17, 4/7/2021 Trial Tr. at 31:22-32:2, and Mr. Estes confirmed that he had no knowledge of what an NRR meant.  *See* 4/6/2021 Trial Tr. at 74:15-24.  So

even if Defendants had followed the EPA regulations to the letter, that would not have affected their use of the CAEv2.

### F.    Statute of repose—Keefer

It is undisputed that Georgia has a strict 10-year statute of repose for products liability actions.  *See* Ga. Code. Ann § 51-1-11(b)(2) ("[n]o action shall be commenced pursuant to this subsection with respect to an injury after *ten years* from the date of the *first sale for use or consumption* of the personal property causing or otherwise bringing about the injury") (emphasis added).  The statute of repose bars all claims of any type filed beyond the repose except claims for failure to warn and any claim for negligence "which manifests a willful, reckless, or wanton disregard for life or property."  G.A. Code Ann. § 51-1-11(c).  It is equally undisputed that Mr. Keefer received his first pair of CAEv2 more than 10 years before filing his claim here.  *See* 4/6/2021 Trial Tr. at 188:2-4.

The Court concluded pretrial that the Servicemembers' Civil Relief Act, 50 U.S.C. § 3936(a), barred application of the statute of repose to Mr. Keefer's claims because the time he served in the military could not be counted towards the 10-year repose period.  That statute excludes military service time from "any period limited by law, regulation, or order for the bringing of any action or proceeding in court." *Id*.  Respectfully, a statute of repose is not a limitation period "for the bringing of any action." *Id*.  Instead, a statute of repose "delineates a time period in which a right

may accrue," so that it "stands as an unyielding barrier to a plaintiff's right of action…so that, on the expiration of the statutory period, the cause of action no longer exists." *Simmons v. Sonyika*, 614 S.E.2d 27, 29 (Ga. 2005) (citations omitted).  As such, the Servicemembers' Act does not apply to a statute of repose.  Thus, Defendants are entitled to judgment as a matter of law on all of Mr. Keefer's claims except failure to warn and gross negligence.

### G.     Statute of limitations—Estes

Georgia has a two-year statute of limitions period for all personal injury claims.  *See* Ga. Code Ann. § 9-3-33 ("Except as otherwise provided in this article, actions for injuries to the person shall be brought within two years after the right of action accrues").  The two-year limitations period applies to all claims for injuries to the person regardless of the legal theory or cause of action asserted.  *See Daniel v. Am. Optical Corp.*, 304 S.E.2d 383, 385 (Ga. 1983) (holding that "[b]y its very language, the scope of application of this statute of limitations is determined by the nature of the injury sustained rather than the legal theory underlying the claim for relief").  Other than cases in which the bodily injury develops only over a long period of time, the cause of action accrues at the time of injury, even if the Plaintiff does not know the cause.  *M.H.D. v. Westminster Schs.*, 172 F.3d 797, 804 (11th Cir. 1999).

In its order denying Defendants' motion for summary judgment, the Court concluded that Mr. Estes' injuries developed over a period of time, thus triggering the "discovery rule."  Yet the testimony at trial confirmed that Mr. Estes began to experience significant tinnitus on a specific date in 2014.  *See* 4/5/2021 Trial Tr. at 73:1-74:6.  And tinnitus, as a subjective complaint, cannot be a latent injury that would trigger the discovery rule.  Because Mr. Estes could pinpoint the exact time that he was injured—and because that time was more than two years before he filed his claims—all of his claims are time-barred.

## CONCLUSION

The Court should enter judgment as a matter of law for Defendants on all or some of Plaintiffs' claims.  In the alternative, the punitive damages awards for all three plainitffs should be reduced so as to not violate Defendants' constitutional rights under the Fourteenth Amendment.  Finally, under Georgia law, there should only be one punitive damages award in the *Estes* and *Keefer* cases.

Dated:  June 1, 2021                              Respectfully submitted:

*/s/ Charles F. Beall, Jr.*                          */s/ Robert C. "Mike" Brock*
Larry Hill                                         Robert C. "Mike" Brock
Florida Bar No. 173908                             KIRKLAND & ELLIS LLP
lhill@mhw-law.com                                  1301 Pennsylvania Avenue, N.W.
Charles F. Beall, Jr.                              Washington, D.C. 20004
Florida Bar No. 66494                              Telephone: (202) 389-5991
cbeall@mhw-law.com                                 mike.brock@kirkland.com
Haley J. VanFleteren
Florida Bar No. 1003674

                                                   Mark J. Nomellini

hvanfleteren@mhw-law.com
MOORE, HILL & WESTMORELAND, P.A.
350 West Cedar Street
Maritime Place, Suite 100
Pensacola FL 32502
Telephone: (850) 434-3541

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-3254
mnomellini@kirkland.com

Kimberly Branscome
DECHERT LLP
633 W. 5th St., Suite 4900
Los Angeles, CA 90071
Telephone: (213) 808-5762
kimberly.branscome@dechert.com

*Counsel for Defendants 3M Company, 3M Occupational Safety LLC, Aearo Technologies LLC, Aearo Holding, LLC, Aearo Intermediate, LLC and Aearo, LLC*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Pursuant to Local Rule 7.1(F) counsel for Defendants certify that this memorandum contains 7,647 words.

 Dated:  June 1, 2021     Respectfully submitted,


         */s/ Robert C. Brock*
         Robert C. "Mike" Brock
         KIRKLAND & ELLIS LLP
         1301 Pennsylvania Avenue, N.W.
         Washington, D.C. 20004
         Telephone:  (202) 389-5991
         mike.brock@kirkland.com

         *Counsel for Defendants 3M Company,*
         *3M Occupational Safety LLC, Aearo*
         *Technologies LLC, Aearo Holding,*
         *LLC, Aearo Intermediate, LLC and*
         *Aearo LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 1, 2021, a copy of the foregoing

was filed on the Court's CM/ECF system, which will serve all counsel of record.


Dated:  June 1, 2021                             Respectfully submitted,


                                                 */s/ Robert C. Brock*
                                                 Robert C. "Mike" Brock
                                                 KIRKLAND & ELLIS LLP
                                                 1301 Pennsylvania Avenue, N.W.
                                                 Washington, D.C. 20004
                                                 Telephone:  (202) 389-5991
                                                 mike.brock@kirkland.com

                                                 *Counsel for Defendants 3M Company,*
                                                 *3M Occupational Safety LLC, Aearo*
                                                 *Technologies LLC, Aearo Holding,*
                                                 *LLC, Aearo Intermediate, LLC and*
                                                 *Aearo LLC*